IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 4, 2023

**IN RE AVALEE W., ET AL.**

**Appeal from the Chancery Court for Campbell County**
**No. 2022-CV-336   Elizabeth C. Asbury, Chancellor**

———————————————————

**No. E2023-00977-COA-R3-PT**

———————————————————

This appeal involves the termination of a mother's parental rights. The trial court found by clear and convincing evidence that six grounds for termination were proven and that termination was in the best interest of the children. The mother appealed. On appeal, the Department of Children's Services "does not defend" three of the grounds that the trial court concluded were established. We reverse these three grounds. Of the three remaining grounds, which DCS maintains were sufficiently proven, we conclude that the ground of substantial noncompliance with a permanency plan was proven by clear and convincing evidence. We further find that termination of parental rights is in the best interest of the children. However, due to insufficiencies in the trial court's findings, we vacate the grounds of persistent conditions and failure to manifest an ability and willingness to assume custody or financial responsibility against the mother. We reverse in part, with respect to three grounds for termination, and vacate in part, with respect to two grounds for termination, but otherwise we affirm the trial court's order terminating parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

Jacob H. Shipley, Jacksboro, Tennessee, for the appellant, Mariah W.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

This matter involves a petition to terminate the parental rights of Mariah W. ("Mother") to her three children, Avalee, Lillith, and Axel.[1] The Department of Children's Services ("DCS") became involved with the family in December 2021 after receiving a referral with allegations of domestic violence and drug-exposed children. Two days later, case managers from DCS arrived at the motel where Mother was staying with her three children and the father of Lillith and Axel. DCS performed a drug screen on Mother, and she tested positive for amphetamine, methamphetamine, and benzodiazepines. DCS subsequently filed a petition in the juvenile court alleging that the children were dependent and neglected and asking the court to award temporary legal custody of the children to DCS. That same day, the juvenile court entered a protective custody order finding probable cause to believe that the children were dependent and neglected and awarding temporary legal custody of the children to DCS. At the time the children were removed from Mother's custody, Avalee was three years old, Lillith was one year old, and Axel was eleven months old. Thereafter, Mother waived the adjudicatory hearing and stipulated that the children were dependent and neglected due to her substance abuse issues. Thus, the juvenile court found by clear and convincing evidence that the children were dependent and neglected and ordered that the children remain in foster care with DCS.

In January 2022, DCS developed the first permanency plan, which was ratified by the juvenile court. The plan required Mother to pay $50.00 per month per child in child support. The plan also included a statement of responsibilities for Mother, which required her to abstain from alcohol abuse and illegal drugs, not associate with active drug users, complete an Alcohol and Drug ("A&D") assessment, and pass random drug tests. Additionally, drug relapses were to be reported to a treatment provider and DCS. She was further required to complete a mental health assessment, anger management classes, and parenting classes and sign a release of information to DCS. Mother was also required to comply with probation orders, pay all fines and court costs, resolve all current legal issues, and refrain from obtaining any new legal charges. The statement of responsibilities further required Mother to obtain and maintain appropriate, safe, and drug free housing adequate in size for the family; obtain and maintain safe and reliable transportation with age appropriate car seats; and provide proof of a valid driver's license, registration and insurance to DCS. To ensure that she could adequately support the children financially, Mother was also required to obtain and maintain legal employment or a legal means of income. Regarding visitation, the statement of responsibilities also required Mother to give a twenty-four hour notice confirming or cancelling visits, to arrive on time for scheduled

---

[1] The petition also concerned the parental rights of the father of Lillith and Axel and of the alleged biological father of Avalee. The father of Lillith and Axel executed a surrender of his parental rights. Likewise, the alleged father of Avalee executed a waiver of interest. Thus, this appeal does not concern their parental rights.

visitation, and to meet the children's age appropriate needs during visitation.[2] The expected completion date for these responsibilities was July 2022. However, before this completion date arrived, the juvenile court ratified a second permanency plan developed by DCS. The plan had substantially the same responsibilities for Mother as the first plan, but the expected completion date was changed to December 2022. The juvenile court ratified a final permanency plan in November 2022 with the same responsibilities and an expected completion date of May 2023.

In December 2022, DCS filed a petition in the chancery court to terminate Mother's parental rights to the three children and alleged the following grounds: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by failure to provide a suitable home; (4) substantial noncompliance with a permanency plan; (5) persistent conditions; and (6) failure to manifest an ability or willingness to assume custody or financial responsibility. DCS further alleged that it was in the best interest of the children for Mother's parental rights to be terminated. A trial was held in May 2023. The court first heard testimony from Autumn Holloway, an employee of DCS. Ms. Holloway testified concerning the development of the permanency plans and Mother's efforts at completing the statement of responsibilities. Ms. Holloway recalled that shortly after the removal of the children, DCS developed the first permanency plan. According to Ms. Holloway, by the time of the first plan's expected completion date in June 2022, Mother had started an inpatient rehabilitation program, but she did not complete it and left on her own. Mother then completed an A&D assessment which recommended completing the MIST[3] program or inpatient treatment. Mother started MIST but did not complete it. Regarding the other tasks on the permanency plan, Ms. Holloway testified that Mother completed mental health assessments; however, DCS had set up funding for parenting classes, but Mother had not completed them. Likewise, according to Ms. Holloway, Mother did not give her information and documentation for proof of transportation or housing. She also said that Mother was living with family members or friends, and housing had been a barrier for Mother. Ms. Holloway also recalled that she had received letters from Mother's employers in the past, but the jobs ended before she received a pay stub as proof of a legal source of income. However, Ms. Holloway stated that on the day of trial, Mother had provided her another letter from her employer. Ms. Holloway said that Mother was arrested for theft and vandalism in January 2022, and in April 2022, she was arrested again for theft and "hold for another agency, which was Anderson County." According to Ms. Holloway, Mother was arrested in August 2022 for failure to appear, and Mother was

---

[2] The first permanency plan included a responsibility for Mother that said "NO CONTACT: Parent will comply with the no contact order until otherwise noted by court." This responsibility also appeared in the third permanency plan. However, the second permanency plan changed the responsibility to read: "If there is a NO CONTACT: Parent will comply with the no contact order until otherwise noted by the court." There is no such no contact order in the record. Also, Ms. Holloway testified at trial that there was never a no contact order against Mother and she was always free to inquire about visits. Therefore, it is unclear why this was included in the statement of responsibilities.

[3] Ms. Holloway testified that MIST stands for Mother Infant Substance Abuse Treatment.

incarcerated around November 2022 for a bench warrant. Ms. Holloway stated that when Mother was incarcerated, she tested positive for fentanyl.

Ms. Holloway further testified that by the expected completion date for the second permanency plan in December 2022, Mother had gone to another rehab and halfway house, but she did not "finish" the halfway house. The recommendations from the rehabilitation program included maintaining the twelve-step program, maintaining sobriety, and completing random drug screens. The halfway house was able to help her find employment and housing, but Mother left in October 2022 without a reason. Concerning Mother's issues with housing, Ms. Holloway testified that DCS offered to pay Mother's first month of rent and that the initial foster parents of the children made a payment to a local housing authority for Mother. She said that Mother applied a couple of months later. She recalled that Mother reported that she was on the waitlist at the housing authority, but Mother never reported whether she had been accepted or denied. Regarding visitation, Ms. Holloway stated that Mother did ask for visits, and in the beginning Mother regularly visited the children, whether through video or in person. She further testified that the visits went well, but from June or July until December 2022, Mother did not visit regularly and her contact with Ms. Holloway was limited. Ms. Holloway attributed the lapse in communication and visitation to Mother being in a relationship with domestic violence. Ms. Holloway further stated that for a period of time, Mother's phone would only work with Wi-Fi, so she could not contact Ms. Holloway when she did not have Wi-Fi. She said that Mother reported to her that she was not living in stable housing between August and October 2022, but she did have one video visit with the children in this period. Ms. Holloway also testified that Mother was ordered to pay child support, initially $50.00 a month per child, but by a court order in October 2022 this was changed to $43.00 a month per child. Ms. Holloway stated that since the children were removed, Mother paid zero dollars in child support, which was confirmed by the Child Support Enforcement Services database.

Regarding Mother's situation at the time of trial in May 2023, Ms. Holloway stated that Mother had recently completed an inpatient substance abuse treatment program, earlier that month, for which Mother provided a certificate of completion. Ms. Holloway described that the certificate of completion said that Mother had completed a "CBT of relapse prevention," a parenting class, and an anger management class. She also explained that Mother was staying at a halfway house as recommended by the inpatient treatment program. She said that she had not received anything saying that the inpatient substance abuse treatment program conducted drug screens on Mother during her inpatient care. Regarding housing, Ms. Holloway also testified that Mother has not presented her with any documentation to show that she has a home suitable for the children. Ms. Holloway recalled that Mother said that she thought that her friend would allow her in her home with the children. She further recalled speaking with the friend about the potential arrangement, but the friend stated to Ms. Holloway that she did not want Mother to have contact with the children during that time. Ms. Holloway also stated that Mother only provided her with the friend's phone number, and the friend would have to agree to give her information to

do a background check.  Likewise, Ms. Holloway testified that Mother failed to obtain proper transportation.  Although, according to Ms. Holloway, Mother wanted to get her friend to be her transportation, Ms. Holloway stated that DCS would need a letter from the friend with her insurance, license, and registration before she would be approved.

Concerning the children, Ms. Holloway testified that the children were initially placed in a foster home on the day they were removed from Mother's custody in December 2021.  The initial foster parents had the children until August 2022, when they could no longer care for the children due to health issues with the foster father.  Ms. Holloway stressed that the change in foster home had nothing to do with the children's behavior.  The children immediately went to a new home, and at the time of trial the children remained in that foster home.  Ms. Holloway stated that the three children are together, and they are doing well in the foster home, which is a potential adoptive placement.  She said that Avalee, the oldest child, had said during visits not supervised by Ms. Holloway that she missed her mother and that she hoped that Mother would get to have custody again, but in the visits that Ms. Holloway supervised, the children did not mention wanting to go back to Mother.  According to Ms. Holloway, Avalee had some trauma for which she is in therapy.  Avalee had nightmares about the past and what she remembered from her time with Mother. Ms. Holloway stated that the children do seem to enjoy speaking with Mother at visits, and the visits do build some type of bond.  However, Ms. Holloway observed that the visits have harmed the children with their traumatic experience from the past.  Although Ms. Holloway noted that it is normal for children to regress in behavior after visits, this is the first case in which she has seen a child have nightmares.

The court then heard testimony from Mother.  Concerning her efforts to address her substance abuse, Mother testified that after the children were removed, she entered drug rehabilitation programs a couple of times, but she admittedly left before completing them due to her self-pity and selfishness.  Mother also described her use of illegal substances as a coping mechanism for a violent relationship that lasted four years.  However, Mother said that she completed the inpatient substance abuse treatment program about nine days before trial in May 2023.  Mother observed that she was finally able to change her life because prayer gave her "determination, courage, strength, self-love, and with the grace of God."  She testified that the things she learned at the treatment program were sticking with her, and she has not used illegal substances since she entered the program.

Regarding her housing situation, Mother recalled that when DCS first arrived at the motel, she was getting ready to file her "income tax" to pay for the room, but because the DCS case manager demanded that she come to the office instead, she was not able to pay her bills and was evicted as a result.  She stated that her application to the local housing authority was denied because at the time she applied, she was in a halfway house in Knoxville.  Although she admitted that there were other places she could get housing, she said that it was hard to get housing because the average rent was high.  When asked if she had anywhere that she would be able to stay if she were not in a halfway house, Mother

answered that she could stay with her friend.  She could not recall, however, the address for her friend's home, and she was not sure about who else lived with her.  She further testified that her friend would be able to provide transportation for her and the children.

Mother also testified concerning her compliance with the permanency plans.  Mother admitted that she was not in compliance from the time of the children's removal until the filing of the petition to terminate her parental rights one year later.  She further admitted that she paid nothing in child support.  However, she recalled bringing the children Christmas gifts and birthday gifts.  She described that at the latest inpatient substance abuse treatment program, she completed anger management and parenting classes.  When asked whether she was randomly screened for drugs at inpatient program, Mother testified that she was screened when she went into the program and was screened when she went to the halfway house.  Mother also said that she now has a job making ten dollars an hour at a landscaping company owned by the person who runs the halfway house where she stays.  Regarding her criminal history, Mother testified that in November 2022, she pled guilty to using Schedule III and V drugs, for which she was placed on probation.  She also recalled pleading guilty to a criminal charge for failure to appear.  She said that she was in jail for twenty-three days in November 2022 due to the failure to appear charges.

In June 2023, the trial court entered an order terminating Mother's parental rights.  The court found that DCS had established the following grounds for termination of the parental rights of Mother: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by failure to provide a suitable home; (4) persistent conditions; (5) failure to manifest an ability and willingness to assume custody or financial responsibility; and (6) substantial noncompliance with a permanency plan.  The court further found that termination was in the best interest of the children. Mother subsequently appealed.

## II.    ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have slightly restated:

1. Whether DCS proved Abandonment by Failure to Visit by clear and convincing evidence;
2. Whether DCS proved Abandonment by Failure to Support by clear and convincing evidence;
3. Whether DCS proved Abandonment by Failure to Provide a Suitable Home by clear and convincing evidence;
4. Whether DCS proved Substantial Noncompliance with a Permanency Plan by clear and convincing evidence;
5. Whether DCS proved Persistent Conditions by clear and convincing evidence;
6. Whether DCS proved Failure to Manifest an Ability and Willingness to Assume

Custody or Financial Responsibility by clear and convincing evidence.

At the outset, we note that DCS states in its brief that it "does not defend the grounds of abandonment by failure to visit, abandonment by failure to support, and abandonment by failure to provide a suitable home on appeal." We therefore reverse the trial court's findings as to these three grounds. *See In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *12 (Tenn. Ct. App. Dec. 22, 2020); *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *6 (Tenn. Ct. App. Oct. 29, 2018) ("[W]hen the petitioner who sought termination has conceded on appeal that a ground was not sufficiently proven, this Court has, in several cases, reversed the trial court's finding as to that ground without reaching the merits of whether the ground was actually established."); *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *7 (Tenn. Ct. App. July 6, 2017) (reversing a ground that DCS "does not defend" and noting that *Carrington* "has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal"). DCS defends only the grounds of substantial noncompliance with a permanency plan, persistent conditions, and failure to manifest a willingness and ability to assume custody and financial responsibility. We therefore proceed to consider these issues.

### III. STANDARDS APPLICABLE TO TERMINATION CASES

One of the most serious decisions courts are called upon to make is the termination of a parent's rights to his or her child. *In re Mariah K.D.*, No. M2011-02655-COA-R3-PT, 2012 WL 3090313, at *6 (Tenn. Ct. App. July 30, 2012). The decision to terminate a parent's rights to his or her child "has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or guardian of the child." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing Tenn. Code Ann. § 36-1-113(l)). Accordingly, "[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015) (citing Tenn. Code Ann. § 36-1-113(l)). "A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (citing *In re Carrington H.*, 483 S.W.3d at 521). Despite being fundamental and constitutionally protected, however, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522 (citing *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010)).

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination as provided in section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interest

of the child under the factors set forth in section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). It also "eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* at 596 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Due to the heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the trial court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure and presume each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. *Grounds for Termination*

#### 1. Substantial Noncompliance with a Permanency Plan

The first ground at issue on appeal exists when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan . . ." Tenn. Code Ann. § 36-1-113(g)(2).[4] The permanency plan responsibilities must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)). Conditions that necessitated foster care may "include conditions related both to the child's removal and to family reunification." *Id.* at 547. "Not every failure to

---

[4] In this opinion, all quotes and references to the termination statute are to the version of the statute in effect when the petition was filed in December 2022. *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

comply with a permanency plan will constitute grounds for termination of parental rights." *In re Jaylan J.*, 2020 WL 7861378, at \*14 (citing *In re Abigail F.K.*, No E2012-00016-COA-R3-JV, 2012 WL 4038526, at \*14 (Tenn. Ct. App. Sept. 14, 2012)). Instead, the noncompliance with the permanency plan must be substantial. *Id.* (quoting *In re Valentine*, 79 S.W.3d at 548). Thus, "[t]rivial, minor, or technical deviations" do not rise to the level of substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

As previously discussed, three permanency plans were created for Mother. We find the responsibilities in these plans to be reasonable and related to remedying the conditions that necessitated foster care placement. Many of the responsibilities in the plans were related to remedying Mother's drug use, which led to the children's initial removal. The responsibilities relating to Mother's parenting, mental health, anger management, housing, transportation, criminal behavior, employment, and visitation were related to the goal of family reunification.

Prior to DCS filing the petition to terminate her parental rights, Mother had completed an initial A&D assessment and a mental health assessment. Mother likewise attended visitation but had lapsed in her attendance in the months before the termination petition was filed. Mother had also incurred new criminal charges. However, after the petition was filed, Mother also completed parenting and anger management classes and, according to her testimony, had abstained from illegal drugs since entering and completing an inpatient substance abuse treatment program, which lasted about a month. Mother also secured employment after the completion of the treatment program, in the week before trial. We recognize that an improvement in compliance with the responsibilities of a permanency plan should be considered in a parent's favor. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Services v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)) (noting that Mother's "poor record of visitation prior to the filing of the termination petition stands in marked contrast to her commendable efforts in the year prior to the hearing"). However, Mother's improvements only began a little more than a month before trial, and she still had not completed significant responsibilities in her permanency plan. By the time of trial, Mother had not obtained safe and stable housing or reliable transportation. We assign great weight to these responsibilities and find Mother's noncompliance with them to be substantial. Adequate transportation and housing were necessary to ensure that it would be safe to reunite the children with Mother. However, at the time of trial, Mother was residing in a halfway house. Although Mother testified that she would be able to stay at her friend's home, she did not provide a location or any information for DCS to run a background check on her. Likewise, Mother also pointed to the friend as someone to potentially provide transportation, but the friend has not provided DCS with any documentation or statements that she is able to do such. Finally, due to the fact that Mother had only completed the inpatient program and obtained employment one week before trial, she had not demonstrated that she could *maintain* her sobriety and employment for any appreciable time period. While we commend Mother's recent efforts, those efforts were simply "too little, too late" to avoid this ground for termination. *See In*

*re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *7 (Tenn. Ct. App. Aug. 15, 2023) (recognizing that an improvement in compliance should be considered in a parent's favor but holding that the mother's efforts at completing permanency plan requirements after the petition for termination was filed were "too little, too late"); *In re Emily N.I.*, No. E2011-01439-COA-R3-PT, 2012 WL 1940810, at *16 (Tenn. Ct. App. May 30, 2012) ("We believe that the [p]arents' refusal to complete a number of the requirements until after the termination petition was filed . . . was simply '[t]oo little, too late' . . . ."). Therefore, we conclude that there is clear and convincing evidence supporting this ground for termination.

## 2. Persistent Conditions

The next ground for termination at issue on appeal is commonly referred to as "persistent conditions" or "persistence of conditions." This ground applies when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

The trial court's order terminating Mother's parental rights contains the following statements regarding this ground:

It is the opinion of the Court that the State has proven by clear and convincing evidence that based on the Mother's failure to take advantage of many opportunities offered to her prior to the filing of the Petition, her current lack of appropriate housing for the children, her criminal activity after removal of the children and her existing lack of appropriate transportation and housing that this ground has been proven by clear and convincing evidence.

As such, the trial court did not make any specific findings with respect to several elements for this ground, including the likelihood of Mother remedying the conditions or whether the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home. Tennessee Code Annotated section 36-1-113(k) requires the trial court in termination cases to "enter an order that makes specific findings of fact and conclusions of law." "Failure to comply with this requirement 'fatally undermines the validity of a termination order.'" *In re Ethan W.*, No. M2021-01116-COA-R3-PT, 2023 WL 415999, at *8 (Tenn. Ct. App. Jan. 26, 2023) (quoting *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004)). Thus, "[t]he absence of appropriate findings supporting this ground [persistent conditions] for termination is not a trivial concern." *In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019). For this reason, we have previously vacated termination orders with respect to the ground of persistent conditions when the trial court did not make specific findings as to each of the elements applicable to this ground. *See id.*; *In re Ethan W.*, 2023 WL 415999, at *8.

Although the trial court's failure to make findings specific to each element would normally necessitate a remand to the trial court for additional findings, because we otherwise affirm the termination of Mother's parental rights on another ground, additional findings on the ground of persistent conditions are not necessary. *See In re Navada N.*, 498 S.W.3d 579, 594-95 (Tenn. Ct. App. 2016); *In re Ethan W.*, 2023 WL 415999, at *8; *In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *8 n.12 (Tenn. Ct. App. Mar. 1, 2021). Accordingly, we vacate the order terminating Mother's parental rights with respect to this ground.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

The final ground for termination on appeal is failure to manifest an ability and willingness to assume custody or financial responsibility. This ground exists when:

A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child . . .

- 11 -

Tenn. Code Ann. § 36-1-113(g)(14). There are two prongs necessary to prove for this ground: "(1) the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Regarding this ground for termination, the trial court made the following statement in its order terminating Mother's parental rights:

> Is [sic] is the opinion of the Court that the State has proven by clear and convincing evidence the Mother has failed to manifest a willingness to personally assume financial and physical custody of the children. She made no real effort to improve her situation until after the filing of the Petition to Terminate Parental Rights. Although she has improved her circumstances at the present time, she cannot currently assume financial and physical custody of the children.

Although the trial court concluded that DCS had sufficiently proven this ground for termination, the court did not make findings responsive to all of the prongs for this ground. Specifically, the trial court did not make any finding as to the second prong concerning whether placing the children in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children. As previously discussed, the trial court is directed by statute to "enter an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). For this reason, this Court has previously vacated a trial court's order as to this ground for failure to make specific findings in support of each prong. *See In re Kamyiah H.*, No. M2021-00834-COA-R3-PT, 2022 WL 16634404, at *7 (Tenn. Ct. App. Nov. 2, 2022) (vacating where order had no findings as to the second prong); *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *6 (Tenn. Ct. App. Apr. 9, 2020) (vacating where order had no findings as to the first prong); *In re Nevaeh B.*, No. E2020-00315-COA-R3-PT, 2020 WL 4920020, at *3 (Tenn. Ct. App. Aug. 20, 2020) (vacating where trial court did not make any finding as to second prong). Thus, we vacate the trial court's order with respect to the ground of failure to manifest an ability and willingness to assume custody or financial responsibility as to Mother. However, as with persistent conditions, further findings on this ground are unnecessary given our ultimate affirmation of the termination of Mother's parental rights.

### B.     Best Interest of the Children

We now turn to address whether the trial court erred in finding that it was in the

best interest of the children to terminate Mother's parental rights.[5]  The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.*  When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors.  *Id.*  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors.  *In re Audrey S.*, 182 S.W.3d at 878.  And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination.  *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).  Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case.  *See In re Audrey S.*, 182 S.W.3d at 878.  Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.  *In re Carrington H.*, 483 S.W.3d at 523.  "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis."  *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017). The twenty statutory best-interests factors are:

---

[5] We note that Mother does not raise an issue or advance any argument on appeal regarding the trial court's finding that termination was in the best interest of the children.  However, pursuant to our Supreme Court's directive in *In re Carrington*, we nonetheless review this finding.  *See In Re Carrington H.*, 483 S.W.3d at 525-26 ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, *regardless of whether the parent challenges these findings on appeal*.") (emphasis added).

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). "When considering the factors [above], the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). After considering these factors, the trial court concluded that it was in the best interest of the children for Mother's parental rights to be terminated. For our review of these factors, because evaluation of these factors often involves discussion of similar issues, we combine our discussion of these factors "based on the overarching themes within the list of twenty factors." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at \*14 (Tenn. Ct. App. May 15, 2023).

We begin by addressing the children's needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning a child's need for stability), (B) (concerning how a change in caretaker would affect a child's well-being), (D) (concerning the attachment between the parent and child), (E) (concerning visitation between parent and child), (H) (concerning the child's parental attachment with individuals other than the parent), and (T) (concerning the effect of the parent's fitness on the child). The children deserve stability at their young age, and they are finding that in their foster home, where they are happy and healthy. In the foster home, their needs are taken care of, and they are receiving adequate health care with necessary therapies. The children's health and happiness in the foster home stands in contrast to the effect of Mother's visitation with the children. After visitation, the oldest child experiences nightmares from her time with Mother, and Ms. Holloway testified that although visitation has maintained some kind of bond between Mother and the children, the visits have also harmed the children with their traumatic experience from the past. Therefore, we find that these factors weigh in favor of termination.

Next, we address the factors pertaining to the physical needs and environment of the children and Mother. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent or the parent's home triggers the child's trauma), (N) (concerning abuse or neglect in the parent's home), (O) (concerning whether the parent has provided safe and stable care to any child in the past), (Q) (concerning the parent's commitment to maintaining a home that meets the child's needs), and (R) (concerning the health and safety of the parent's home). At the time of trial, Mother resided in a halfway house. As such, Mother did not obtain and maintain housing that is stable and safe for the children, and for this reason, it would be detrimental to the children to return them to the care of the Mother. Likewise, visitation with Mother has caused the children to relive traumatic experiences from their time in Mother's home, with the oldest child experiencing nightmares as a result of trauma. Furthermore, there is nothing in the record to indicate that Mother has provided safe and stable care to any child in the past. Therefore, we find that these factors weigh in favor of termination.

We now consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (concerning the parent's demonstration of continuity and stability in meeting the child's needs), (J) (concerning the parent's lasting adjustment of circumstances), (K) (concerning the parent's use of available programs, services, or community resources), (L) (concerning DCS's efforts), (M) (concerning parent's sense of urgency), (P) (concerning the parent's understanding of the child's needs), and (S) (concerning whether the parent has paid more than token financial support). Although DCS has made extensive efforts to connect Mother with resources, Mother did not take advantage of many of these resources in order to effect lasting change until less than a month before trial. Mother likewise did not complete many of her permanency plan responsibilities until after DCS filed the petition to terminate her parental rights. This delay in completing these responsibilities and entering into the inpatient substance abuse treatment program reveals that Mother did not have a sense of

- 16 -

urgency in seeking custody of the children. Mother has also not demonstrated an understanding of the children's needs. Ms. Holloway testified that Mother did not inquire about the children's medical and education situations and that Mother has not truly comprehended the depth of trauma that she has caused the children. Mother has also paid nothing in monetary child support. Although she gave gifts to the children at visitation, this kind of support is token. We therefore find that these factors weigh in favor of termination.

Finally, we address factors (F) (concerning whether the child is fearful of living in the parent's home) and (I) (concerning the child's relationship with others). The trial court did not hear any testimony regarding whether the children would be fearful of living in Mother's home. Likewise, there was no testimony regarding the children's relationships with persons other than their parents and caregivers or how termination would affect these relationships. Therefore, we find these factors inapplicable in the present case.

We have reviewed the best interest factors and agree with the trial court's conclusion that there was clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children. Therefore, we conclude that the trial court did not err in finding that termination of Mother's parental rights was in the best interest of the children.

## V.    CONCLUSION

For the aforementioned reasons, we reverse the termination of parental rights of Mariah W. as to abandonment by failure to support, failure to visit, and failure to establish a suitable home and vacate the termination of parental rights as to persistent conditions and failure to manifest an ability and willingness to assume custody or financial responsibility. Otherwise, we affirm the trial court's order terminating the parental rights of the mother, Mariah W. We remand for further proceedings consistent with this opinion.

Costs of this appeal are taxed to the appellant, Mariah W., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE